## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD of ELECTRICAL WORKERS LOCAL NO. 150 WELFARE FUND, on behalf of itself and all others similarly situated, | Civil Action No. |
| Plaintiff, | COMPLAINT<br>CLASS ACTION |
| v. | DEMAND FOR A JURY TRIAL |
| WELLDYNE RX, LLC, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.    JURISDICTION AND VENUE ....................................................................5

III.   THE PARTIES ...............................................................................................5

IV.   FACTUAL BACKGROUND .........................................................................6

      A. WellDyne's Co-Pay Card Rebate Game.....................................................10

      B. IBEW 150 Fund Uncovers WellDyne's Misconduct................................19

V.    CLASS ACTION ALLEGATIONS...............................................................20

VI.   CLAIMS FOR RELIEF ...............................................................................21

COUNT I

      BREACH OF CONTRACT ..........................................................................21

COUNT II

      BREACH OF THE IMPLIED COVENANT OF  GOOD FAITH AND
      FAIR DEALING...........................................................................................23

COUNT III

      UNJUST ENRICHMENT ............................................................................24

VII.  PRAYER FOR RELIEF...............................................................................25

VIII. JURY DEMAND .........................................................................................25

Plaintiff International Brotherhood of Electrical Workers Local No. 150 Welfare Fund ("IBEW 150 Fund" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendant WellDyneRx, LLC ("WellDyne" or "Defendant"), and alleges as follows:

## I.    PRELIMINARY STATEMENT

1.    Defendant WellDyne is a pharmacy benefit manager ("PBM") that has consistently breached its contractual obligations to IBEW 150 Fund and the Class by failing to pay them required rebates or securing rebates it was contractually obligated to obtain.  IBEW 150 Fund is a health benefits fund established through collective bargaining between an electrical workers union in Illinois and an association of electrical contractors in Illinois.  IBEW 150 Fund, like WellDyne's other customers, contracts with WellDyne as a PBM to administer the pharmacy benefits that IBEW 150 Fund provides to its members and their beneficiaries. Entities like IBEW 150 Fund, which pay for medical and pharmaceutical benefits for members, beneficiaries, employees, retirees or other eligible individuals (referred to collectively herein as "members"), are referred to as "third-party payors" ("TPPs").  WellDyne's contracts with IBEW 150 Fund and the Class of WellDyne's other TPP customers, provide for WellDyne to negotiate with drug manufacturers to secure rebates that lower the costs of drugs, and to pass along those rebates to its TPP customers.

2.    In most cases, when a member fills a prescription, the member is charged a co-payment or "co-pay," reflecting a portion of the cost of the medication; the member's TPP pays the balance of the cost of the drug.  WellDyne, on behalf of its TPP customers, negotiates with drug manufacturers to secure a rebate to reduce the cost of the drugs, and then shares that rebate with its TPP customers.  Through this structure, TPPs pay their share of the costs of prescriptions filled by their members, and then receive from WellDyne payments reflecting rebates paid by drug manufacturers, thereby reducing the TPPs' costs of providing prescription drug coverage to their members.

3.    Members can avoid or mitigate the expense of paying the co-payment on their prescriptions by using what are referred to as "co-pay cards."  A co-pay card is typically offered by a drug manufacturer directly to patients (i.e., the members or beneficiaries of a TPP), and incentivizes those patients to fill their prescriptions using that manufacturer's drug by eliminating the co-payment expense.  A TPP member filling a prescription using a co-pay card is not charged a co-payment on that prescription, or might be charged a reduced co-pay.  Such prescriptions are otherwise processed by WellDyne in the ordinary course, just as prescriptions for which the member was charged a co-payment.  Importantly, the TPP stills pays its normal share of the drug costs, regardless of whether the TPP member used a co-pay card to reduce or eliminate the co-payment.

4.     WellDyne's contracts with IBEW 150 Fund and the Class do not limit or exclude the payment of rebates on prescriptions filled using co-payment cards. This makes sense because the TPPs pay the same amount for a prescription regardless of whether their members are charged a co-payment or use a co-pay card. Because the TPP must pay the same amount, TPPs should thus be entitled to a rebate regardless of whether a co-pay card is used.

5.     In contrast to the contracts' silence regarding co-pay cards, the contracts expressly exclude from rebates certain prescriptions filled using other payment methods.  For example, distinct from co-pay cards are other cards used by members, known as "discount cards," which provide a reduced cost total for the medication. Prescriptions filled using discount cards are not processed by WellDyne as typical prescriptions, and no aspect of the transaction cost is charged to WellDyne's TPP customers.  WellDyne's contracts with the Class expressly discuss "discount cards" and provide that prescriptions filled using discount cards are not eligible for rebate payments.

6.     Similarly, WellDyne's contracts exclude from rebates prescriptions where multiple insurers or TPPs may have an obligation to cover the prescription costs.  Such situations are referred to in the industry as "coordination of benefits" or "COB" claims.  Where multiple insurers may have an obligation to pay some or all of the drug cost, there is a need to coordinate among them to provide for that payment

and avoid double-billing.  WellDyne's contracts with the Class expressly provide that certain "COB claims" are not eligible for rebate payments.

7.    Co-pay cards, however, do not share any of the features of a COB claim, and WellDyne had an obligation to secure and pass along rebates from drug manufacturers for prescriptions filled with co-pay cards.  Despite this obligation, WellDyne has consistently refused to pay its TPP customers rebates on certain prescriptions filled using co-pay cards, despite there being no contractual provision excluding such prescriptions from rebate payments.  Co-pay cards do not fall within any of the contractual exclusions on rebate payments, such as those pertaining to COB claims or discount cards.

8.    WellDyne is either improperly withholding monies it received from drug manufacturers on co-pay card prescriptions that should have been paid to IBEW 150 Fund and the Class as rebates, or improperly failed to negotiate with manufacturers to secure rebates on such prescriptions, as it is required to do.

9.    This is not the first time WellDyne has cost its PBM clients millions of dollars by failing to adhere to its contractual obligations regarding rebates.  A former WellDyne customer – Suffolk County, New York – terminated WellDyne after multiple audits revealed that WellDyne "did not achieve contracted terms," caused "substantial shortfalls in rebates, pricing, discounts and fees due" to Suffolk County, and "incorrectly categorized drugs dispensed under the plan causing the under-

performance of pricing guarantees." WellDyne paid $2.8 million to compensate Suffolk County for the harm caused by its violation of rebate obligations and other breaches. In a separate matter, WellDyne and a co-conspirator paid more than $7 million after the Office of the Inspector General uncovered their Medicaid kickback scheme.

10.    This class action seeks to recover the rebates that WellDyne improperly withheld from IBEW 150 Fund and the Class, or failed to secure from drug manufacturers, on certain prescriptions filled using co-pay cards.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and Plaintiff and members of the proposed Class are citizens of states different from the Defendant.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because WellDyne is headquartered in Lakeland, Florida, and a substantial part of the events giving rise to the claims occurred in this District.

## III.    THE PARTIES

13.    Plaintiff IBEW 150 Fund is an employee welfare benefit plan based in Illinois that contracted with WellDyne to provide PBM services.

14.     Defendant WellDyne is a limited liability company headquartered in Lakeland, Florida. WellDyne provides PBM services to self-insured employers, health plans, and other payers throughout the United States. WellDyne owns and operates specialty and mail order pharmacies and maintains proprietary programs purportedly aimed at helping its customers reduce and otherwise manage prescription drug costs.

## IV.    FACTUAL BACKGROUND

15.     A third-party payor ("TPP") is an organization that pays for medical expenses on behalf of customers, members, participants, beneficiaries, or their family members.  Examples of TPPs can include multi-employer Taft-Hartley health and welfare funds, such as IBEW 150 Fund, as well as public employers, commercial insurance companies, and self-insured employers.

16.     Members of a TPP generally pay premiums or premium contributions (for employer-sponsored plans) for coverage, and/or have premiums paid on their behalf by an employer. Similarly, multiemployer Taft-Hartley health funds act as TPPs and similarly secure health and prescription drug coverage on behalf of their union member beneficiaries funded through the payment of employer contributions and, in some case, employee co-premiums that are paid to such multiemployer Taft-Hartley funds.

17.    When a TPP member fills a prescription, their TPP typically pays the majority of the cost of that prescription. The remainder of the cost is generally covered by the member in the form of a co-payment and/or a deductible payment.

18.    WellDyne, like other PBMs, manages prescription drug benefits for its TPP customers by acting as an intermediary between the TPP clients and drug manufacturers. As PBMs, including WellDyne, repeatedly tell their customers, the primary responsibility of a PBM is to save its customers money.

19.    PBMs like WellDyne enter into contracts with TPPs to provide programs, supposedly designed to maximize savings and limit drug expenditures by negotiating favorable rates with pharmacies and drug manufacturers. This typically includes the negotiation of a rebate that the manufacturer provides to the PBM, and which the PBM then shares, in whole or part, with its TPP clients.

20.    In a typical situation, the role of the PBM is as follows: the patient visits a network pharmacy; the pharmacy checks with the PBM to confirm patient eligibility, coverage, and co-payment information; the patient pays the co-payment (and any deductible) at the pharmacy to purchase the drug; the PBM then reimburses the pharmacy for the remainder of the negotiated drug price, including the ingredient cost and a dispensing fee, less the co-payment (and any deductible); the PBM then bills the TPP for the payments it made to the pharmacy on behalf of the TPP under the contract between the TPP and the PBM. On a periodic basis, the PBM sends the

TPP payment, reflecting the rebates recovered on prescriptions filled by its members, thereby reducing the TPP's cost of providing the drug coverage to its members.  This scenario can be illustrated as follows:



21.    The rebates that WellDyne is required to negotiate with drug manufacturers on behalf of its TPP clients are a lynchpin of WellDyne's contracts with the Class, as the rebates provide a primary mechanism through which WellDyne delivers cost savings to its clients.

22.    Indeed, one of the primary services that WellDyne offers its clients is its ability to deliver cost savings on medications.  WellDyne's website touts the numerous ways it saves its customers money, promising "Smarter Strategies, Bigger Savings." WellDyne expressly assures its TPP customers that "we don't play rebate

games," and promises that there is "No fine print, no-gimmicks—just smarter pharmacy benefits."

23.    This process is also described in WellDyne's customer agreements. IBEW 150 Fund's contract with WellDyne, which refers to IBEW 150 Fund as "Plan Sponsor" or "Client," provides:

> WellDyneRx receives Rebates from pharmaceutical manufacturers or rebate aggregators several months after claims are adjudicated, for being included on WellDyneRx'[s] Formulary. After WellDyneRx receives Rebates from pharmaceutical manufacturers or rebate aggregators, a reconciliation will occur to insure that Plan Sponsor has been passed through 100% of all Rebates attributable to Plan Sponsor's utilization.

24.    WellDyne's contracts with IBEW 150 Fund and the Class required WellDyne to negotiate with drug manufacturers to secure rebates to achieve those promised savings.    For example, IBEW 150 Fund's contract provides that "WellDyneRx shall use commercially reasonable efforts to obtain such rebates" and that WellDyne will "negotiate rebates with pharmaceutical manufacturers and pass through to Client a specified percentage of those rebates received by WellDyne for eligible claims."

25.    Moreover, the contracts include tables that set out the rebates to be paid on various types of drugs, thereby confirming WellDyne's obligation to secure and

pass through to the Class such rebates.[1]    Nothing in the contracts excludes prescriptions filled using co-pay cards from rebate eligibility.

### A.    WellDyne's Co-Pay Card Rebate Game

26.    Rather than honor its contractual promises and avoid "rebate games," WellDyne played "rebate games" by failing to obtain or pay rebates for drugs for which a member used a "co-pay card."

27.    Co-pay cards are often issued by drug manufacturers, and are sometimes referred to as manufacturer coupons, co-pay coupons or co-pay assistance programs.  Prescriptions purchased by a member using a co-pay card are processed by WellDyne like any other prescription. The pharmacy will run the claim through WellDyne, the member's PBM, as usual, applying the coverage and pricing terms negotiated by WellDyne for the member's TPP.  The manufacturer's co-pay coupon then typically applies to reduce, even to zero, the co-payment amount the member owes for that prescription.  WellDyne pays the pharmacy the same balance for that prescription that it would have paid had the member paid the co-payment in cash rather than using a co-pay card.  WellDyne then bills the TPP for that same balance, just as it would if the member had paid the co-payment in cash rather than using a co-pay card.

---

[1] The agreement defines rebates to mean "any discounts, rebates, administrative fees, market share incentives, or any other source of revenue received by WellDyneRX from a pharmaceutical manufacturer or a rebate aggregator as a result of utilization related to Plan Sponsor."

28.     In other words, the claim still goes through WellDyne as the member's PBM, and the member's TPP will still be charged that same amount as its share of the drug cost.  The only difference is that the manufacturer's co-pay card covers part or all of the member's co-payment obligation, reducing the member's out-of-pocket cost.  So, if a member of IBEW 150 Fund fills a prescription using a co-pay card, the payment for that prescription is processed by WellDyne (as IBEW 150 Fund's PBM) just like a prescription filled without using a co-pay card, and IBEW 150 Fund pays its contracted portion of the prescription cost.  This scenario can be illustrated as follows:



Scenario 2: Co-Pay Card

29.     Nothing in WellDyne's contracts with the Class excludes prescriptions purchased using co-pay cards from the payment of rebates to TPPs.  Neither do the

contracts relieve WellDyne of its obligation to negotiate with manufacturers to secure rebates on prescriptions filled using a co-pay card.

30.     In stark contrast, WellDyne makes explicitly clear that certain other types of situations will result in the exclusion of a prescription drug from rebates. For example, WellDyne's client contract states that:

> The following claims are excluded from Rebate Guarantees: claims adjudicated through a government sponsored program or pharmacy, Non diabetic supplies[,] OTC claims, 340B claims, Non Specialty COB claims, Discount Card claims, CDHP/HDHP claims, LTC/HI/ITU pharmacy claims, and other claims not eligible for rebates.

31.     The contract fails to define many of the terms used in this provision, including "Discount Card claims" and "COB claims."   Co-pay cards are not referenced in this provision, or in any other provision of the contract dealing with rebates.

32.     For many of the claims excluded from rebate guarantees, understanding the nature of the claim and how it is processed makes clear why rebates might not be applicable.   For example, "discount cards" are widely understood in the pharmaceutical industry to refer to cards or programs offered by various companies, such as GoodRx and Amazon (which offers the PrimeRX discount card, administered by another PBM, Express Scripts), that act as the patient's insurer for that particular transaction.   When a patient uses a discount card, the pharmacy processes entirely outside that patient's standard insurance benefit program: if a

member of a TPP uses a discount card when paying for a prescription, her TPP is not billed.  The discount card is presented at the pharmacy in lieu of an insurance card. The claim adjudication goes through the discount card's PBM or administrator (not the PBM of the patient's insurance plan or TPP), which has pre-negotiated its own rates for the drugs; no charge is sent to the patient's TPP.  So, if a member of IBEW 150 Fund fills a prescription using Amazon's PrimeRX discount card, for example, the payment for that prescription is not processed by WellDyne (as IBEW 150 Fund's PBM), and would instead be processed by Express Scripts (the PBM with which Amazon partnered for PrimeRX), with no charge to IBEW 150 Fund.  TPP members may prefer to use a discount card because the total cost to the patient may be lower for certain prescriptions, compared to the cost of the required co-payment if purchasing the drug with coverage provided by the patient's TPP.  In such a case, any amount paid by the patient using the discount card is not applied to the patient's insurance deductible or out-of-pocket maximum because the patient's insurance was not used.  Under the "discount card" scenario, the TPP is not involved in the transaction:



**Scenario 3: Discount Card**

33.     Pharmacists and researchers describe discount-card claims as "cash" transactions, meaning the sale is outside the insurance benefit structure. Indeed, even though a PBM (like Express Scripts in the Amazon PrimeRX example) may be behind the scenes negotiating prices, the transaction is considered a cash payment claim from the perspective of the PBM that contracted with the patient's TPP (such as WellDyne, for a prescription filled by an IBEW 150 Fund member using a discount card).  This model yields savings for the patient upfront, but it bypasses the normal insurance claim process entirely.  Accordingly, WellDyne is not part of the process when the members of its TPP customers fill prescriptions using such discount cards.  It therefore makes sense that WellDyne's TPP customers would not receive a rebate for discount card claims, for which they are never charged.

34.     An important distinction between co-pay cards and discount cards is that, with co-pay cards, the prescription is filled within WellDyne's framework (not bypassing it).  The co-pay card simply subsidizes the patient's share of the cost, while WellDyne adjudicates the claim and charges its TPP client for the remainder of the drug's cost.  For that reason, the rebates that WellDyne is obligated to pay its TPP clients still apply to prescriptions filled using co-pay cards because the TPP client's cost is the same even if its beneficiary avoids paying a co-payment.

35.     Numerous publications and leading industry sources describe how co-pay cards are used by insurers and patients, and confirm that the use of a co-pay card does not obviate the collection of a rebate from a drug manufacturer, and payment of such rebate to the TPP.  For example, an article in *The Rheumatologist* explains that, when using co-pay cards, "the manufacturer must still pay a rebate to the insurer, but the patient can continue to use a copay card for the large co-insurance without paying out of pocket for the medication."  Similarly, an article by Dr. Adam Fein, of the Drug Channels Institute, discusses various co-payment assistance programs and explains that, even if a patient is charged a reduced co-payment or no co-payment, such prescriptions "are [] eligible for rebates and administrative fees."

36.     As noted, WellDyne's TPP contract also fails to define "COB claims," which are widely understood in the industry to refer to a claim for which multiple insurers may have an obligation.  For example, the National Council for Prescription

15

Drug Programs ("NCPDP") – which sets standards for pharmacy claims – describes a "coordination of benefits" or "COB claim" as "the mechanism for the pharmacy to bill multiple entities when there is more than one entity involved in the claims process," thereby allowing secondary payers to receive information about what the prior (primary) payer covered. The reference to "multiple entities" means insurance or benefit plans (such as an employer-sponsored health plan, multiemployer Taft-Hartley health plans, Medicare Part D plan, state assistance program, or other benefits provider) covering the patient. As the NCPDP makes clear, the purpose of this processing of COB claims "allows entities involved in pharmacy claims processing to determine respective payment responsibilities including determination of primary payer and the extent to which other entities will contribute when an individual has more than one payer option."

37. Similarly, the National Association of Insurance Commissioners ("NAIC") provides a model rule governing COB claims: the "Coordination of Benefits Model Regulation." That model defines "Coordination of benefits" to mean a "provision establishing an order in which plans pay their claims, and permitting secondary plans to reduce their benefits so that the combined benefits of all plans do not exceed total allowable expenses." The model regulation further provides that the "purpose of this regulation" is to:

A.    Establish a uniform order of benefit determination under which plans pay claims;

B.   Reduce duplication of benefits by permitting a reduction of the benefits to be paid by plans that, pursuant to rules established by this regulation, do not have to pay their benefits first; and

C.   Provide greater efficiency in the processing of claims when a person is covered under more than one plan.

38.    A transaction involving a COB claim can be illustrated as follows:



39.    In the scenario involving a COB claim, the participation of multiple payors or insurers creates complexity that could make it difficult or impossible for rebates to be paid, for example if each payor or insurer was entitled to a different rebate from the same manufacturer.  Contractually precluding the payment of rebates on COB claims addresses that concern.

40.     By contrast, a co-pay card, though covering a portion of the cost of a drug, is not a form of insurance.  Manufacturers that issue co-pay cards make this clear.  For example, the terms of a co-pay card issued by manufacturer Bristol Myers Squibb state: "The Co-pay Card… is not health insurance."  Similarly, the NAIC model regulation defining a "Plan" does not include manufacturer co-pay cards.

41.     Unlike the complex situation involved with COB claims described above, the use of a co-pay cards does not require any "coordination" of benefits: WellDyne's TPP client pays its regular share of the drug cost, without involvement of any other insurer or plan, regardless of whether the TPP member pays a co-pay or uses a co-pay card.

42.     Despite processing prescriptions filled using co-pay cards, and charging IBEW 150 Fund and the Class for their normal portion of the costs of such prescriptions, WellDyne has failed to remit rebates for certain such claims to Plaintiff and the Class.

43.     WellDyne's refusal to remit rebates on all prescriptions filled using co-payment cards constitutes a breach of its contractual obligations and a violation of the implied covenant of good faith and fair dealing.  To the extent that WellDyne has received rebates, fees or other funds from drug manufactures in connection with prescriptions filled using co-pay cards and has retained such funds rather than

remitting them to the Class, WellDyne has unjustly enriched itself at the expense of Plaintiff and the Class.

44.    In the alternative, to the extent that WellDyne has not received rebates from manufacturers for prescriptions filled using co-pay cards, WellDyne breached its obligation to negotiate and secure such rebates from manufacturers, and has been unjustly enriched by the fees paid by IBEW 150 Fund and the Class for PBM services because the TPPs' contracts with WellDyne required WellDyne to negotiate and secure rebates.

45.    WellDyne's agreements with IBEW 150 Fund and the Class require WellDyne to administer PBM services faithfully, negotiate to secure rebates to lower drug costs and to remit rebate amounts fairly and transparently. WellDyne's conduct subverts the purpose of the PBM agreements and deprives IBEW 150 Fund and the Class of the benefit of their bargain, costing them millions of dollars

**B.    IBEW 150 Fund Uncovers WellDyne's Misconduct**

46.    WellDyne's failure to secure rebates for prescriptions filled through co-pay cards was not obvious or apparent to its TPP customers.  For example, the regular reporting materials WellDyne submitted to IBEW 150 Fund and other TPPs did not reflect that such rebates were not being secured or passed on.  Indeed, a core function of WellDyne's job on behalf of IBEW 150 Fund and other TPPs is to manage the rebate process, as that is WellDyne's expertise, and exactly what IBEW 150 Fund

paid WellDyne to do.  In fact, IBEW was only able to uncover WellDyne's failure to secure rebates following an audit conducted by one of IBEW 150 Fund's outside consultants.  Specifically, after an extensive investigation in which IBEW 150 Fund and its outside consultant requested additional information from WellDyne that it had not previously provided to IBEW 150 Fund and repeated follow-ups, IBEW 150 Fund uncovered in 2025 that it had been harmed as a result of WellDyne's improper co-pay card misconduct, and promptly brought this suit.  Accordingly, WellDyne's misconduct that gives rise to claims herein was not readily apparent to, or discoverable by, the Class.

## V.    CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action on behalf of itself and a Class of all similarly situated entities pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure defined as: "All current and former PBM customers of WellDyne that were denied rebates on prescriptions filled using co-payment cards."

48.    The Class is so numerous that joinder is impracticable.  Upon information and belief, the Class consists of hundreds of TPPs.

49.    There are questions of law and fact common to the Class, including:

a.    Whether WellDyne received rebates on prescriptions processed using co-pay cards;

b.    Whether the WellDyne's agreements with the Class required WellDyne to remit such rebates to its customers;

     c.      Whether WellDyne breached its contracts by failing to remit all such rebates;

     d.      Whether WellDyne breached its obligations to the Class by failing to negotiate to secure rebate payments (and/or failing to secure such rebates) for prescriptions processed using co-pay cards;

     e.      Whether WellDyne breached the implied covenant of good faith and fair dealing; and,

     f.      The measure of damages suffered by Plaintiff and the Class.

50.    Plaintiff's claims are typical of the Class. Plaintiff contracted with WellDyne for PBM services and was subject to the same improper withholding of rebates alleged herein.

51.    Plaintiff will fairly and adequately protect the interests of the Class and has retained experienced class counsel.

52.    A class action is superior to other available methods for adjudicating this controversy. Class treatment will permit a fair and efficient adjudication of the claims and avoid the risk of inconsistent judgments.

## VI.   CLAIMS FOR RELIEF

### COUNT I

### BREACH OF CONTRACT

53.    Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

54.    WellDyne entered into PBM contracts with Plaintiff and Class members.

55.    These contracts required WellDyne to negotiate with drug manufacturers on behalf of its TPP clients to obtain rebates, and to remit such rebates to Plaintiff and the Class, except where explicitly excluded.

56.    No such contractual exclusion applies to prescriptions filled using co-pay cards, and for prescriptions filled using co-pay cards, WellDyne was obligated to negotiate and secure rebates and remit rebates to Plaintiff and the Class.

57.    WellDyne processed claims for prescriptions filled using co-pay cards on behalf of Plaintiff and the Class, but failed to remit rebates for certain such claims.

58.    By failing to remit such rebates, WellDyne breached its contractual obligations to Plaintiff and the Class.  WellDyne either obtained rebate payment from drug manufacturers for such claims and breached the contract by failing to remit payment of such rebates to Plaintiff and the Class or, in the alternative, failed to negotiate to obtain rebates for such claims from drug manufacturers (or otherwise failed to secure such rebates), thereby breaching its contracts with Plaintiff and the Class.

59.    As a result, Plaintiff and the Class suffered damages in the form of unpaid rebates, and the interest thereon.

## COUNT II

### BREACH OF THE IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

60.    Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

61.    Every contract includes an implied covenant of good faith and fair dealing.

62.    WellDyne's contracts with IBEW 150 Fund and the members of the Class obligated WellDyne to negotiate rebates with drug manufacturers and to remit such rebates to members of the class.

63.    WellDyne's conduct in failing to pay rebates for certain co-pay card transactions – despite processing such claims as standard transactions – constitutes bad faith and unfair dealing.

64.    WellDyne acted to deprive Plaintiff and the Class of the benefits of their agreements.  WellDyne either obtained rebate payment from drug manufacturers for co-pay card claims and violated the implied covenant of good faith and fair dealing by failing to remit payment of such rebates to Plaintiff and the Class or, in the alternative, WellDyne failed to negotiate to obtain rebates for such claims from drug manufacturers (or otherwise failed to secure such rebates), thereby violating the implied covenant of good faith and fair dealing.

65.     As a result, Plaintiff and the Class have been damaged and are entitled to recover the rebate amounts improperly withheld, as well as interest thereon.

## COUNT III

## UNJUST ENRICHMENT

66.     Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

67.     WellDyne negotiates with drug manufacturers to secure payment of fees, rebates and other payments from those manufacturers, purportedly on behalf of and for the benefit of its TPP clients, including Plaintiff and the Class.

68.     Any such funds received by WellDyne in connection with prescriptions filled using co-payment cards, which were not paid as rebates to Plaintiff and the Class, served to unjustly enrich WellDyne at the expense of its clients.

69.     Under its contracts, WellDyne has no right to retain funds from drug manufacturers the payment of which WellDyne negotiated on behalf of and/or for the benefit of its TPP customers.

70.     In the alternative, to the extent that WellDyne failed to negotiate with drug manufacturers to obtain rebates on behalf of Plaintiff and the Class (or otherwise failed to secure such rebates), WellDyne was unjustly enriched by the payment of fees by Plaintiff and the Class for PBM services that purported to include the negotiation of such rebates.

71.   As a result, Plaintiff and the Class have been damaged and are entitled to recover any such funds by which WellDyne was unjustly enriched, as well as interest thereon.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that this Court:

1.   Declaring the action to be a proper class action under Fed. R. Civ. P. 23;

2.   Awarding Plaintiff and the Class damages, in an amount to be proven at trial, including interest;

3.   Awarding Plaintiff and the Class their reasonable costs and expenses, including attorneys' fees; and

4.   Awarding such other relief as the Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: September 26, 2025                Respectfully submitted,


_____ / Robert D. Klausner
**KLAUSNER,   KAUFMAN,   JENSEN
  & LEVINSON**
Robert D. Klausner (Bar No. 244082)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Liaison Counsel*

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Avi Josefson*
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
michaelb@blbglaw.com

*Lead Counsel for IBEW Fund*